## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TAYLOR ENERGY COMPANY LLC, | CIVIL ACTION |
| Plaintiff, | NO. |
| VERSUS | SECTION: |
| COUVILLION GROUP, LLC, | MAGISTRATE: |
| Defendant | |

### COMPLAINT FOR DECLARATORY JUDGMENT AND FOR OTHER RELIEF

TO:   THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA AND THE HONORABLE JUDGES THEREOF

The Complaint of Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), through its undersigned counsel, and against Defendant, Couvillion Group, LLC, avers as follows:

### PARTIES

1.

At all material times, Taylor Energy was and is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal place of business in New Orleans, Louisiana, and was and is duly authorized to transact business within the jurisdiction of this Honorable Court.  Taylor Energy's only member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, State of Louisiana.

2.

Made defendant is Couvillion Group, LLC ("Couvillion").   At all material times, Couvillion was and is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal place of business in Belle Chasse, Louisiana, and was and is

{N3747640.2}

duly authorized to transact business within the jurisdiction of this Honorable Court.  Couvillion's only member is Timothy Couvillion, a Louisiana resident domiciled in Plaquemines Parish, State of Louisiana.

## JURISDICTION AND VENUE

3.

Jurisdiction exists under the Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and as a civil action arising under the Constitution and Laws of the United States pursuant to 28 U.S.C. § 1331, including the Oil Pollution Act of 1990, 33 U.S.C. §§ 2700-2762 and the attendant regulations, the Clean Water Act, 33 U.S.C. § 1321 and the attendant regulations, the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333 and the attendant regulations, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  This Complaint concerns matters that will take place upon the navigable waters of the United States and bear a significant relationship to maritime activity.

4.

Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Further, a substantial part of the events and omissions giving rise to Taylor Energy's claims against Couvillion occurred in this District, including the United States Coast Guard's ("Coast Guard") issuance of the Administrative Order No. 19-001 dated October 23, 2018 ("Admin. Order"), the November 6-9, 2018 Unified Command meeting related to Taylor Energy's platform and former well site in the Gulf of Mexico, and the Coast Guard's subsequent selection of Couvillion as the contractor to design, construct and install a subsea containment system pursuant to the Admin. Order, the issuance of Notice of Federal Assumption dated November 16, 2018 (the "Notice") and a Decision Memorandum dated November 16, 2018 (the "Memo").

## RELEVANT FACTUAL BACKGROUND

5.

This action arises out of an actual case and controversy between Taylor Energy and Couvillion concerning work currently being performed and to be performed by Couvillion for the Coast Guard at the request of the Coast Guard's Federal On-Scene Coordinator ("FOSC"), Captain Kristi M. Luttrell, including Couvillion's design, construction and installation of a subsea "Rapid Response" containment system that is to be attached to and fully supported by Taylor Energy's downed platform jacket, which is partially buried and lies on the seabed in federal waters adjacent to the State of Louisiana in approximately 475 feet of water in Mississippi Canyon Block 20 (the "MC20 site").

6.

As set forth more fully below, Taylor Energy believes that Couvillion is not professionally qualified to undertake the work contracted by the Coast Guard and is unfamiliar with the lengthy and complex history at the MC20 site. Taylor Energy has advised Couvillion of its concerns and has requested information from Couvillion. Taylor Energy also placed Couvillion on notice that it will hold Couvillion responsible for any damages, environmental or otherwise, that might arise out of Couvillion's reckless and grossly negligent activities at the MC20 site. Couvillion, however, has refused to provide Taylor Energy with any detailed and specific information regarding the activities it has undertaken and plans to undertake that could adversely affect the value of Taylor Energy's property at the MC20 site or cause further damage to the MC20 site itself, which might result in further financial exposure of Taylor Energy as the Responsible Party for the incident known as the MC20 – Taylor Energy Response (hereafter the "MC20 Incident"). Taylor Energy

fears that Couvillion's lack of professional qualifications and unfamiliarity with the site have the potential to cause catastrophic environmental damage.

7.

Prior to the sale of substantially all of its assets during 2008, Taylor Energy's principal business was the exploration, development and production of oil and gas on the Outer Continental Shelf of the United States ("OCS") in the Gulf of Mexico.  Taylor Energy was the lessee and operator of a fixed production platform, known as the MC20A Platform, and an OCS lease that includes the MC20A Platform, wells and associated facilities (collectively "MC20").  The MC20 site is located in federal waters adjacent to the State of Louisiana in an offshore lease area known as Mississippi Canyon Block 20, which is approximately 10 miles offshore of the coast of Louisiana at the mouth of the Mississippi River.

8.

On or about September 16, 2004, Hurricane Ivan struck the Louisiana and Mississippi Gulf Coasts.  Prior to Hurricane Ivan, there were 28 wells connected to the MC20A Platform, 3 of which were temporarily abandoned, 8 of which were shut in indefinitely, and 17 of which had been producing , 13 of which could produce only with lifting assistance, but which were shut-in when the platform was evacuated due to the approach of Ivan.[1]

9.

Ivan alternated between a Category 4 and a Category 5 storm and, through an Act of God event, caused a massive unforeseen and unprecedented seafloor shift and failure that toppled

---

[1] By "lifting assistance" Taylor Energy means adding artificial conventional measures to promote and enable production.

Taylor Energy's production platform and scattered debris on and under the seafloor.  Taylor Energy's MC20A Platform currently is partially buried and lies on the seabed on its side and is located about 550 feet downslope and southeast from its original location, and the well bores rest in a buried tangled web.  The wells were buried beneath approximately 150 feet of mud and sediment, the stationary well conductors were shifted out of the platform's well bay, and each well conductor (and related tubular assemblies) was bent at almost a 90 degree angle (the "MC20 Incident").

10.

Taylor Energy immediately notified the appropriate governmental authorities of the loss of the platform and began responding to the MC20 Incident, including addressing a sheen of oil on the water's surface in the area where the platform once stood.  Taylor Energy was designated by the Coast Guard as the "Responsible Party" for the MC20 Incident in accordance with the Oil Pollution Act of 1990.

11.

Taylor Energy is currently a member of the "Unified Command," which was established by the Coast Guard in the Fall of 2007 consistent with the National Contingency Plan to monitor the MC20 site and to study possible further action to be taken.  From the start, Taylor Energy's overarching concern has been, and continues to be, to ensure protection of the environment, to take actions that are supported by best science principles, and not to undertake actions that will aggravate or worsen conditions at the MC20 site, all to avoid the risk of causing a substantial threat of discharge of oil and thus an environmental catastrophe.

12.

Effective June 28, 2007, the MC20 OCS lease terminated.  Consistent with its regulatory practice and procedure, in October of 2007, the Government ordered Taylor Energy to permanently plug and abandon ("P&A") all wells at MC20 by June 28, 2008.  Thereafter, Taylor Energy and the Government recognized the difficulty of pursuing decommissioning of the wells through conventional plugging and abandonment techniques due to (among other things) the burial of the tangled well bores.  They therefore agreed to examine alternatives for decommissioning the wells, including the concept of drilling "intervention" wells to plug the existing wells.[2]

13.

Following detailed studies, and with the express consent and approval of all necessary Governmental authorities, including the Coast Guard, Taylor Energy successfully drilled nine intervention wells.  This action successfully sealed each of the nine MC20 wells that had the highest flow potential and that posed a substantial threat of discharge of oil in their post-Ivan condition.  These activities reduced, but did not completely eliminate, the surface sheen.

14.

For more than a decade, the Coast Guard and Taylor Energy have acted under the Unified Command structure and have engaged in extensive and comprehensive collaborative studies, assessments, and evaluations to address the MC20 Incident, including coordination of all response actions.

---

[2] A diagram (not to scale) depicting the tangled well bores is attached hereto as Exhibit "A".

15.

Taylor Energy has provided all reasonable cooperation and assistance requested by federal officials and has been an active participant in numerous Unified Command meetings that were convened by the various FOSCs.  There have been a total of six Coast Guard officers that have served as FOSC over the past decade and, effective June 15, 2018, Coast Guard officer Captain Kristi Luttrell became the FOSC.

16.

On October 21, 2018, <u>The Washington Post</u> ran a front page story on the MC20 Incident that  contained inaccurate information about the MC20 site and referenced an unverified study done by a purported expert witness retained by the United States Department of Justice ("DOJ") in litigation between Taylor Energy and the United States Department of the Interior ("DOI").  The Washington Post story also questioned the Coast Guard's competency with respect to its handling of response activities at the MC20 site.

17.

Without any advance notice, on October 23, 2018, Taylor Energy was served with the Admin. Order issued under the Clean Water Act that was executed by the FOSC, Captain Luttrell, and which, without explanation, rescinded and replaced prior Admin. Order 12-001 and announced an entirely new "federal position" with regard to the MC20 Incident.

18.

The Admin. Order stated that "[r]ecently developed information related to source location and conditions at the MC20 site, combined with a review of previously existing information,

warrant issuance of this new administrative order." It further announced a "new" federal position that:

> 1. One or more wells are actively discharging oil and gas from the erosional pit near the former Dome C location.
>
> 2. The worst-case estimate of the daily volume of release far exceed previous estimates and is in the order of hundreds of barrels per day.
>
> 3. Temporary containment and recovery of oil being discharged at the erosional pit near the former Dome C location is needed and feasible while a more permanent solution to stopping the source is developed."

*See* Exhibit "B" attached hereto.

19.

The Admin. Order "ordered" Taylor Energy to "institute a containment system to capture, contain, and remove oil from the erosional pit near the former Dome C location."

20.

The Admin. Order further notified Taylor Energy that a Unified Command Planning meeting would be held from November 6-9, 2018 "for the purpose of evaluating containment and recovery systems and developing an implementation plan and timeline." The Admin. Order stated that a "workshop" would be held during the Unified Command meeting "to evaluate proposals from potential contractors on the design of an effective containment system" and directed Taylor Energy "to conduct new market research prior to the November Unified Command meeting and make arrangements with potential contractors to provide an overview of potential designs and service based on the attached documentation." The Admin. Order also stated that:

> The containment system must eliminate the surface sheen and avoid the deficiencies associated with prior containment systems. Design of the containment system shall take into consideration the site

> conditions provided to you.  The containment system shall be designed to contain an amount with a worst case daily discharge between 250 barrels and 700 barrels per day.  A design of a minimum of 250 barrels per day is acceptable at this time.

The Admin. Order also represented to Taylor Energy that, "[b]y the conclusion of the Unified Command meeting, 06-09 November, **WE** will select one of the proposals presented during the workshop."  *See* Exhibit "B" (emphasis added).

21.

The documents accompanying the Admin. Order reference a study by Oscar Pineda- Garcia ("the Garcia theory"), which forms the predominant basis for conclusions set forth in the Admin. Order.  The Garcia theory was developed by a Government-paid purported and not yet qualified "expert witness" that the DOJ retained for a lawsuit between Taylor Energy and the DOI pending in the United States Court of Federal Claims.  The Garcia theory thus was prepared solely as a part of the DOJ's litigation strategy, was not developed or studied under the Unified Command structure, and Mr. Garcia's qualifications and methodology have never been accepted.  Nor has the Garcia theory been peer reviewed or otherwise verified in any manner.  Prior to Taylor Energy's receipt of the Admin. Order, it was unaware that the Coast Guard intended to rely upon the Garcia theory or that Admin. Order 12-001 would be rescinded.

22.

The Admin. Order gave Taylor Energy 24 hours to seek "a review and reconsideration" of the Admin. Order and provided that the FOSC's "decision upon reconsideration is a final agency action."  *See* Exhibit "B."  On October 24, 2018, Taylor Energy timely submitted to the Coast Guard a written request for a review and reconsideration of the Admin. Order, *see* Exhibit "C"

attached hereto, which was denied by the Coast Guard the next day on October 25, 2018.  *See* Exhibit "D" attached hereto.

23.

On November 5, 2018, Taylor Energy provided the FOSC with copies of two written proposals.  One of these proposals included utilizing the containment domes Taylor Energy had constructed in accordance with Admin. Order 12-001 at a cost of nearly two million dollars.  These domes currently are located in a warehouse and are available for deployment should changed circumstances warrant it.  Taylor Energy's containment domes were never ordered deployed by the Coast Guard, despite Taylor Energy's confirmation to the Coast Guard that it would place the containment domes at the "X" and "Y" coordinates to be provided by the Coast Guard.

24.

On November 5, 2018, Taylor Energy requested that the Coast Guard and FOSC provide it with copies of the contractor presentations that were to be presented at the upcoming Unified Command meeting.  The FOSC improperly denied Taylor Energy's request based on the Procurement Integrity Act, a statute that does not apply to a situation in which the Government instructs a non-governmental entity, like Taylor Energy, to enter into a private contract with another private party.

25.

At the Unified Command meeting sessions it was allowed to attend, Taylor Energy formally objected to the Coast Guard's arbitrary, capricious and unlawful actions.  Its objections included an objection to the FOSC's decision to exclude Taylor Energy, a member of the "Unified Command," from attending and participating in the "workshop" sessions where the Coast Guard

received and evaluated various contractor presentations.  Taylor Energy also objected to the Admin. Order's reliance upon the unverified Garcia theory, as it was not conducted, coordinated or authorized by the Unified Command.  Taylor Energy further objected to the FOSC's failure to provide Taylor Energy with the facts and data purportedly supporting the basis for the Admin. Order.

26.

On November 6, 2018, Taylor Energy and its representatives were directed to leave the afternoon Unified Command sessions so that the Coast Guard and FOSC could hear various contractor presentations, including a presentation by Couvillion.  On November 8, 2018, and pursuant to the Admin. Order, Taylor Energy presented to the Unified Command two contractor proposals for the most effective proposed containment system design.  After Taylor Energy's presentations took place, Captain Luttrell and the Coast Guard excluded Taylor Energy from any further discussions or deliberations on the selection of a contractor.  This was contrary to the express terms of the Admin. Order, which stated that, "[b]y the conclusion of the Unified Command meeting…**WE** will select one of the proposals presented during the workshop."  *See* Exhibit "B," p. 2 (emphasis added).

27.

On the afternoon of November 9, 2018, Captain Luttrell verbally advised Taylor Energy that Couvillion had been selected as the contractor under the Admin. Order.  Despite Taylor Energy's exclusion from the contractor presentations and its lack of knowledge of any details concerning Couvillion's or the other contractors' proposals, Captain Luttrell informed Taylor Energy that it would have only 24 hours to "execute" a "take it or leave it" contract with Couvillion.

28.

Captain Luttrell then instructed Taylor Energy to appear at the Coast Guard Sector New Orleans office on the afternoon of November 13, 2018 to attend a presentation by Couvillion, the contractor the agency had already selected contractor.  The FOSC subsequently provided Taylor Energy with a copy of Couvillion's written proposal dated November 5, 2018, which shows, among other things, Couvillion's proposal for "…a subsea Rapid Response Solution which is fully supported by the existing jacket [i.e., Taylor Energy's downed platform.]"  *See* Exhibit "E" attached hereto.  Couvillion's proposal further reflects that the installation of the containment system will require use of dynamically-positioned vessels and divers.  The work outlined in Couvillion's proposal will take place on navigable waters, bears a significant relationship to traditional maritime activity, and has the potential to disrupt maritime commerce.

29.

At the outset of the November 13, 2018 meeting, Taylor Energy requested that Couvillion and the Coast Guard provide a copy of the proposed contract that Taylor Energy was being requested to execute.  However, neither the Coast Guard nor Couvillion had prepared a draft contract for Taylor Energy's review and consideration.  Nor did Couvillion have a detailed scope of work or any specifics in terms of the timing, pricing, identity and availability of subcontractors capable of performing the work, insurance, or any other specific commercial or legal terms.  Nevertheless, Captain Luttrell verbally advised that Taylor Energy had until 5:00 p.m. on Thursday, November 15, 2018 to execute the contract with Couvillion.

30.

Thereafter, Taylor Energy, at Couvillion's request, provided its standard draft master service agreement.  Couvillion responded the next morning with its proposed form contract,

including a proposed scope of work.  Couvillion subsequently provided a proposed escrow agreement requiring that Taylor Energy deposit five million dollars "in escrow" within 24 hours of contract execution to be used to compensate Couvillion.  The terms proposed by Couvillion provided Taylor Energy with <u>no</u> meaningful rights or protections and failed to afford Taylor Energy any rights to participate in the performance of the work, as the Responsible Party or otherwise.  Couvillion's draft documents also did not provide Taylor Energy with any rights in terms of the verification of invoices or the release of its funds for payment for any services provided.  Despite this extreme one-sidedness, Taylor Energy diligently continued its efforts to conclude a commercially reasonable contract with Couvillion by the November 15, 2018 5:00 p.m. deadline unilaterally set by Captain Luttrell.

31.

Taylor Energy advised Captain Luttrell and Couvillion shortly before the deadline that, given the time constraints and other limitations resulting from the process undertaken, Taylor Energy was unable to execute a contract with Couvillion by the 5:00 p.m. deadline.  Taylor Energy also confirmed that it remained willing to work on an appropriate containment solution, including entering into a commercially reasonable contract with Couvillion.

32.

Notwithstanding the November 15, 2018 deadline, Taylor Energy continued its efforts to negotiate a commercially reasonable contract including providing Couvillion with updated drafts of proposed contract documents.  On November 16, 2018, Couvillion advised it "… was unwilling to agree to Taylor Energy's proposed contract changes."

33.

On November 16, 2018, Captain Luttrell issued a Notice of Federal Assumption (the "Notice") and a Decision Memorandum (the "Memo").   *See* Exhibits "F" and "G" respectively, attached hereto.  In the Notice, the Coast Guard stated that it would "partially assume response actions" pertaining "…to all activities related to the development and installation of a containment system; removal and disposal of oil collected in the containment system; and maintenance of a containment system at the MC20 site, as identified in Administrative Order 19-001."  The Notice further provided that "Federal assumption does not relieve you of your financial responsibilities and your obligation to abate the source of the discharge.  Taylor Energy Company's requirement to conduct overflights and respond to recoverable oil remains."  *See* Exhibit "F."

34.

On November 20, 2018, Taylor Energy acknowledged receipt of the Notice and formally requested that the FOSC: (A) provide Taylor Energy with a complete copy of the executed contract between the Coast Guard and Couvillon, including all exhibits, scopes of work, attachments, etc.; (B) copy Taylor Energy on all communications between the Coast Guard and Couvillion related to performance of the contract in light of the Notice's statement that Taylor Energy was not relieved of its additional response obligations and financial responsibilities; (C) provide Taylor Energy with a copy of the PowerPoint presentation made by Couvillion on November 13, 2018; and (D) provide the support, including written documentation and legal authority, that allegedly authorized Couvillion to use Taylor Energy's property, as Couvillion had indicated in its proposal that it intended to recover and reuse Taylor Energy's equipment related to its existing subsea containment system.  *See* Exhibit "H" attached hereto.

35.

In response, Captain Luttrell denied Taylor Energy's formal requests, in direct contravention of previously agreed upon procedures and protocols that were part of the Unified Command structure. *See* Exhibit "I" attached hereto. Indeed, rather than cooperating and assisting Taylor Energy in its ongoing response efforts and facilitating Taylor Energy's efforts to comply with the Admin. Order and the Notice by keeping Taylor Energy informed of Couvillion's activities, Captain Luttrell suggested that Taylor Energy submit a Freedom of Information Act ("FOIA") request and contact Couvillion for the PowerPoint, even though she was already in possession of both.

36.

On November 28, 2018, Taylor Energy cautioned Couvillion regarding undertaking work at the MC20 site, indicating the risks posed given Couvillion's lack of sufficient familiarity with the site and with the voluminous administrative record related to the MC20 response, including numerous scientific studies that had been performed over the years at the joint request, endorsement and consensus of the Coast Guard and Taylor Energy to delineate and define the conditions at the MC20 site. Taylor Energy also expressed concern that the Coast Guard had failed to provide Couvillion with pertinent information necessary to undertake further response activities, including reports and analyses related to stability and sediment conditions at the site. Taylor Energy further informed Couvillion that it had serious concerns about the structural integrity of the jacket and the seafloor stability at the site, as acknowledged by the Minerals Management Service ("MMS") in prior correspondence to Taylor Energy related to the Government's authorization to allow Taylor Energy's jacket to remain in place on the seafloor. *See* Exhibit "J" attached hereto.

37.

On November 28, 2018, Taylor Energy requested that Couvillion:  (A) provide Taylor Energy with a complete copy of the contract between Couvillion and the Coast Guard to perform response operations, including all exhibits, scopes of work and attachments; (B) copy Taylor Energy on and provide it with all communications between the Coast Guard and Couvillion related to Couvillion's performance of the contract in order to keep Taylor Energy fully informed of Couvillion's activities and in light of Taylor Energy's ongoing obligations and responsibilities; and (C) provide Taylor Energy with a copy of the PowerPoint presentation shown by Couvillion at the November 13, 2018 meeting, which PowerPoint presentation had already been given to the Coast Guard and shown to Taylor Energy.

38.

Given these concerns, Taylor Energy placed Couvillion on formal notice that Taylor Energy did not consent to or authorize Couvillion to undertake any activities on or affecting Taylor Energy's jacket, including but not limited to, the use of the jacket as support for the subsea "Rapid Response Solution" depicted on Couvillion's proposal materials and the PowerPoint presentation. Taylor Energy also placed Couvillion on formal notice that it would hold Couvillion fully responsible for any and all damages, including environmental damages, that may arise as a result of Couvillion's activities at the MC20 site.  *See* Exhibit "J."

39.

On December 6, 2018, Couvillion confirmed to Taylor Energy that it was working and continuing to work as directed by the "Unified Command" and that Couvillion had signed a non-disclosure agreement with the Coast Guard.  Accordingly, Couvillion refused to provide Taylor Energy with any of the requested information, including a copy of its contract and of the

PowerPoint presentation. Couvillion then requested documents from Taylor Energy, which documents are already reasonably available to Couvillion from the Coast Guard, the party who is directing Couvillion. *See* Exhibit "K" attached hereto.

40.

On December 13, 2018 Taylor Energy reiterated its concern that Couvillion's actions would cause an environmental catastrophe. It again formally notified Couvillion about its exposure and liability for direct damages due to its reckless and grossly negligent conduct at the MC20 site. *See* Exhibit "L" attached hereto.

41.

Despite Taylor Energy's request to Couvillion (as well as the Coast Guard), it has never been provided with a copy of the contract between the Coast Guard and Couvillion. Taylor Energy also has not been provided with any of the documents accompanying the contract, including the detailed scope of work describing the services and design work to be undertaken by Couvillion and/or its subcontractors with regard to the "Rapid Response Containment System" to be installed at the MC20 site and to be physically attached to Taylor Energy's downed jacket.

42.

Based on current information, Taylor Energy believes that Couvillion, and/or others acting at the request of Couvillion, will attempt to physically attach a subsea containment system to Taylor Energy's jacket, without the consent or authorization of Taylor Energy. Because of documented concerns Taylor Energy and the Government have regarding the condition of the jacket and existing site conditions at MC20, Taylor Energy believes that the actions of Couvillion could cause significant environmental damage and other associated problems at the MC20 site.

Accordingly, Taylor Energy requests that the Court enter declaratory judgment recognizing that Couvillion does not have Taylor Energy's authorization to conduct any activities at the MC20 site, including the lack of Taylor Energy's authorization to attach the containment system or any of its component parts to Taylor Energy's jacket and to use components of Taylor Energy's subsea containment system, and further recognizing that Taylor Energy shall not be liable or responsible for any damages, including any environmental damages, that may arise as a result of Couvillion's activities at the MC20 site.

## CAUSES OF ACTION

43.

## COUNT I

## UNAUTHORIZED USE OF TAYLOR ENERGY'S PROPERTY

The allegations of Paragraphs 1 to 42 are copied herein *in extenso*.

44.

Pursuant to 43 U.S.C. § 1333, the Constitution and laws of the United States extend to the subsoil and seabed of the Outer Continental Shelf and to all artificial islands and other installations or devices permanently or temporarily attached to the seabed, and the laws of the adjacent State (in this case Louisiana) are declared to be the law of the United States.

45.

As Taylor Energy has notified Couvillion, Taylor Energy does not consent to or authorize any activities by Couvillion at the MC20 site, including the attachment of any containment system or other device to Taylor Energy's downed platform jacket or property. Any actions by Couvillion to install any equipment on, alter, improperly use, or otherwise disturb Taylor Energy's property are unlawful, and constitute a trespass and/or an unlawful and unauthorized use of Taylor Energy's

property, entitling Taylor Energy to recover all damages that may arise from Couvillion's activities at the MC20 site.

46.

Couvillion's illegal use of Taylor Energy's jacket at the MC20 site constitutes unauthorized use and control of Taylor Energy's personal property.  Couvillion's illegal use of Taylor Energy's jacket at the MC20 site also constitutes dispossession of and intermeddling with Taylor Energy's chattel.

47.

Couvillion is justly indebted to Taylor Energy for all damages arising from Couvillion's recklessness, gross negligence, acts and/or omissions, trespass, unauthorized or unlawful use of property, dispossession of goods or property, and/or conversion of Taylor Energy's property.

48.

**COUNT II**

**COMPLAINT FOR DECLARATORY JUDGMENT**

The allegations of Paragraphs 1 to 42 are copied herein *in extenso*.

49.

In accordance with 28 U.S.C. § 2201, Taylor Energy is entitled to a declaratory judgment against Couvillion that:  (A) Taylor Energy does not authorize or consent to Couvillion undertaking any activities on or affecting Taylor Energy's downed platform jacket and subsea containment system at the MC20 site, including but not limited to, the use of the jacket as support for any subsea rapid response system as depicted in Couvillion's proposal materials dated November 5, 2018 and PowerPoint shown to Taylor Energy on November 13, 2018; (B)

exonerating Taylor Energy from any and all claims and liability that may arise from Couvillion's activities at the MC20 site, including any environmental damages or third-party claims; (C) declaring that Couvillion and any subcontractors of Couvillion will be liable and legally responsible for any and all damages, including environmental damages, that arise out of Couvillion's or its subcontractors' activities at the MC20 site.

50.

## COUNT III

## REQUEST FOR INJUNCTIVE RELIEF

The allegations of Paragraphs 1 to 42 are adopted as if copied herein in *extenso*.

51.

By reason of Couvillion's actions and planned actions, Taylor Energy requests that the Court enter appropriate permanent mandatory or prohibitory injunctive relief against Couvillion, permanently enjoining Couvillion and/or any parties acting in concert with or at the direction of Couvillion from undertaking any activities at the MC20 site affecting Taylor Energy's property.

WHEREFORE, Taylor Energy Company LLC prays that the foregoing Complaint be deemed good and sufficient and that after due proceedings have been had, including all discovery necessary to have a full and complete record, that the Court enter declaratory judgment and a monetary judgment as set out above in favor of Taylor Energy Company LLC and against Couvillion Group, LLC, as follows:

1. Recognizing that Couvillion does not have the authority to conduct any activities at the MC20 site, including the lack of authority to attach its containment system, or any of its component parts, to Taylor Energy's jacket or property;

2. Recognizing that Taylor Energy is exonerated and shall not be liable or responsible for any damages, including any environmental damages and any third party claims, that may arise as a result of Couvillion's activities at the MC20 site;

3. Awarding Taylor Energy all monetary damages that may arise from Couvillion's activities at the MC20 site, including that of its subcontractors;

4. Entry of permanent mandatory or prohibitory injunctive relief permanently enjoining Couvillion and/or any parties acting in concert with or at the direction of Couvillion from undertaking any activities at the MC20 site affecting Taylor Energy's property; and

5. Awarding Taylor Energy any other legal and equitable relief to which it is entitled and as the Court may deem appropriate, including costs and reasonable attorney's fees.

Dated, this 20th day of December, 2018.

Respectfully submitted,

*s/ Carl D. Rosenblum*

CARL D. ROSENBLUM, T.A. (#02083)
RICHARD D. BERTRAM (#17881)
ALIDA C. HAINKEL (#24114)
LAUREN C. MASTIO (#33077)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8296
crosenblum@joneswalker.com

**Counsel for Taylor Energy Company LLC, Plaintiff**